Our fourth case for today is United States v. Jones. Ms. Schrupp. Thank you, Your Honor. May it please the Court, I'm Sarah Schrupp from Northwestern Pritzker School of Law and I represent Appellant Bruce Jones. This Court should reverse Jones' health care fraud conviction or at a minimum reverse and remand for resentencing on all counts for four reasons. I'm going to start with the sentencing issue first and then turn to the issues of law because to this 69-year-old man whom the District Court acknowledged was non-violent and ill, the erroneously imposed 100-month sentence resulted in at least a three-fold increase in his sentence. Without it, he would have by now served all or nearly all of his time. And because this erroneous sentence contravenes directly the purpose and the language of the guideline that the District Court used to impose it, this Court should reverse. I'm going to start with a couple of core concepts here to try to simplify what turned out to be kind of a complicated issue in the briefing. The first core concept is the concept of instant offense. And under the guidelines and this Court's cases, instant offense means the conduct charged in the indictment, nothing more, nothing less. Here, the government charged Bruce Jones with possessing firearms and ammunition between March and June of 2010. So that is the offense conduct. Now, there's the related concept of relevant conduct. And that is separate, uncharged, additional conduct that can be factored into the guidelines if it happens during the commission of the offense or in its preparatory stages or perhaps in its aftermath to avoid detection. But these acts must be separate. So as a result, the conduct charged in indictment, the indictment offense, cannot also constitute relevant conduct. This separate relevant conduct orbits around the instant offense, the indictment conduct. And here's where the concept of timing comes in. The commission believes that certain convictions, those imposed more than 15 years before the instant offense, should not be used in calculating a defendant's sentence because they don't reflect his current criminality. And that's especially true where, as here, the defendant is not a recidivist. Jones is not really a recidivist. He had one prior conviction from 1985. And so, although the guidelines do say that relevant conduct can be taken into account as it orbits around the instant offense, it only can shift the 15-year look back just that little bit of additional time. What do you mean little bit of additional time? Well, relevant conduct has to be related to the instant offense. I mean, it can go outside of it temporarily, but it doesn't go back. This court has never held that acts or things that happen decades before the core of the instant offense can constitute relevant conduct. I'm just wondering if it depends on the type of offense, though, because some offenses, such as being a felon in possession of a firearm, are what we might think of as continuing offenses. As long as you're a felon and you have the firearm, you're always in a state of committing that offense. I don't know why the look back for relevant conduct is just a short one. Well, because, Your Honor, because it's defined, the instant offense is defined by what the government chose to charge. Length of possession is not something that the guidelines account for at all. It's not in the guidelines. Number of firearms is, for example, and that allows an increase, but length of possession is not there. But he was committing the 922G offense the whole time, though, right, from the time he has these guns up until the time he's arrested. Are you saying way back in 1996 or? Yeah, I mean, when was he not committing the 922G offense from the time he gets the guns? Well, Your Honor, I again would point to, the government engages in a calculus as to what it's going to charge this defendant with. Well, I understand it's not charge, but I mean, it's relevant conduct if you're going to say part of the course of conduct that he's been indicted for in this indictment is the possession, and the possession itself stretches back, you know, maybe for some person it would stretch back one year, maybe for somebody else it would stretch back five years. For him it happens to be a lot of years, but. I disagree, Your Honor, I really do think it needs to be tethered to what was charged in the indictment, because. So what's your cutoff then? It's the indictment conduct, and then if there are additional. Nothing beyond the indictment. For length of possession, that's right. I mean, number of firearms. Let's say he possessed another firearm a month before or something like that. Perhaps under this course three prong test, yes, that would come in. How many firearms did he possess? Well, he got in, I think it was in the 40s, but he, yes, but he did. A couple of years? I beg your pardon? For the 15 years they could have been picked up two each year. Well, but the government never proved that, Your Honor. All they did was prove what he had when he was arrested, and that was in that time frame. So, again, it's tethered to what the government chooses to bring and what they opt to try. Now, if they had gone back and charged him with possession back in 1996, and had gone through and tried to prove a continuous possession all through those years, then perhaps we would be looking at something different. But they can't charge a snippet in time and then suddenly basically add an automatic enhancement for every defendant because they now claim after the fact in order to bump up the sentence threefold that somehow this is. This is not every case, right? We've got the prenuptial agreement. We've got other indications that he was in possession and in control of firearms going back at least as early as 1996, right? Well, I just, well, actually, Your Honor, I'm sorry. For sentencing purposes. Well, no, well, two points here. That answers the question because, I mean, as you know, for better or for worse, the guidelines often, through the relevant conduct provisions, wind up recommending a much more stringent sentence than the charged crime would suggest. Yes, but the guidelines don't account for length of possession. And to get back to your point, Judge Hamilton, there is a difference between ownership and possession. And what those documents say is that he owned them. He didn't control them necessarily. They were spent many, many years at his friend's house. So although the government conflates those, that's not, they didn't prove that this was anything more than ownership as opposed to possession. But what I will say, Your Honor, is yes, there are things that the guidelines specifically account for. Length is not one of them. Now, I will say that if the district court had chosen to account for this under 3553A, it could have done it. But this court has repeatedly acknowledged that the district court must engage in a correct interpretation of the guidelines at the get-go. And then if it chooses to take that into account as the seriousness of his offense later under 3553, by all means, go for it. But it's subject to a different standard of review and not the presumption of correctness to a correct guideline sentence. And this guideline sentence. The critical point you're making, and, you know, of course the government will address it as well, is that you don't think relevant conduct in the sense of part of the same course of conduct can sweep in something like a possession offense, even if there's evidence such as the prenuptial agreement that Judge Hamilton referred to, to indicate that the possession has been going on for some number of years. But if the relevant conduct can go back that far, then the 1985 felony drug conviction comes into the picture, right? If you get back to 1996? Unfortunately, yes. But again, to look at the one case that they cite from this circuit, which is Ellis, which says it's a continuing possession, that case is totally an opposite. First of all, it dealt with a double jeopardy challenge, like you can't charge somebody twice with a continuous possession. But notably, in that case, the two prosecutions were within the instant offense time. They were in this core of time. They both happened in the same time. It wasn't a situation where let's look decades back and call that some sort of continuous possession for decades. It just seems fundamentally unfair. So can you figure out what your legal principle is to cut off relevant conduct for a possession offense? I can understand a factual principle. So there's going to come a time that the government can't prove that the possession was happening at that time. And maybe in a lot of cases, the government's ability to prove is going to be cut off much closer to the offense time. This happens to be a case where that's not so. So that's a factual cutoff. What's the legal cutoff that you're trying to use? For possession? For relevant conduct, if the person's been charged with possession of firearms and now the government wants to say, well, actually part of that, for sentencing purposes, course of conduct of the possession, it goes back X months, years, time. So you don't think they can do it at all? Or if you do think they can do it, how far back can they go? No, they cannot do it at all because possession is the element, possession is what they charged in the offense conduct, and possession doesn't go back. So you're saying that 1B1.1 just does not apply to possession offenses? Well, it doesn't apply for the 15-year look-back to extend the temporal reach. No, it doesn't. And that's the only reason that you would use 1B1.1. The only reason you would construe a continuing offense or this conduct offense backwards is for that purpose. So, no, the guidelines don't account for that. I'd like to turn next to the pretrial restraint of the life insurance policies because the district court also erred in restraining these policies pretrial without requiring the government to show that they were tainted and without holding a hearing before doing so. Assuming that was an error, how does this record show any prejudice? Well, he was prejudiced because he didn't have access to assets that he could have used to hire a lawyer, and so he would have had a different lawyer. Why not raise that with the district court, or did he? He did not raise that with the district court. So why shouldn't we treat that as, in essence, a forfeiture of the whole issue? I mean, this seems a lot like challenging a temporary restraining order on appeal after a final jury verdict is in. Well, Luis came out after both the trial and actually after the appeal had become underway, and it changed... Your theory, though, is that this was just completely unjustified from the get-go, that this was an improper ex parte application, and if there was a problem, if that was causing him harm, I would have expected him to take it to the district court. Well, Your Honor, I would point out one factual thing, is that he was, during the entire process of where this was happening, in the middle of April, right before, of 2014, he was basically operating without counsel during that time. His retained lawyers had moved to withdraw, and he had been granted IFP status just a few days before the government filed its ex parte motion. Then during that time, he had been given IFP status, but had not been given a new attorney. Did the IFP application refer to the life insurance policies? No, but you're saying, why didn't he raise it? Well, it was first of all because it was ex parte, and secondly, he didn't have somebody to raise it. So he would have been necessarily raising it after the fact, and my point is only this. Yes, he would necessarily have been raising it after the fact, but this is the kind of problem that is temporary and fixable, right? Yes. So why should we undo the whole case because of that temporary, fixable problem never brought to the attention of the district court? Because the intervening decision in Louise changes the calculus somewhat. So what it says is, there may be no pretrial restraint absent a showing by the government, and that showing has to happen at the forefront. So these intervening decisions are binding on this court. It changed the calculus, and I'd like to just turn quickly to say that the way that the government used 853 here brings it squarely under Louise. This is a routine application of Louise, and although it may seem strange to have to unwind it and go back, that's what happens when there's intervening Supreme Court decisions that impact it. He's entitled to a new trial to consider the fact that his untainted assets were restrained, and that's exactly what happened here. By relying on these and calling them in the alternative as substitute assets, those are by their nature untainted assets that step in when there aren't enough tainted assets. So this is just a routine application of Louise. They restrained pretrial his untainted assets, and he should get a chance to at least go back and have the opportunity to proceed properly. Now the government argued that he wasn't indigent even after the restraint of the insurance policies. Isn't that right? Yes, they did, but there's at least five indications in the record as to why that's not true. First, the district court granted him IFP status. Secondly, his lawyer acknowledged in the sentencing hearing that he hadn't even been paid a fraction of what he had been promised. Third, he was in jail for over a year, and he had no counseling license, so he wasn't making money. He had an intervening divorce. They point to a 2009 balance sheet, but he had gotten divorced in the meantime. And finally, the government had previously restrained all his real estate with a lease pendants hold, so he didn't have those assets either. I'm well into my rebuttal, but I just want to make one more quick point, Your Honor. The district court also erred in finding that he voluntarily waived his right to testify, and again, this is just a routine application of this court's cases in Ward and Ortega, because even when it's ill-advised. We can look at your brief for that. Okay, thanks. All right, that's great. If there's no further questions, I'll reserve. Okay, thank you. That's very good. Mr. Reitz. May it please the court, Brian Reitz for the government. I would like to start with the 853 issue and then move back to the sentencing. Judge Hamilton, I think that is the linchpin. Your question is the linchpin of this case. Jones had every opportunity to make that challenge under this court's procedures and Moya Gomez. In fact, he was invited to do so. The government docket 201 said that in this situation, you can challenge the post restraint, you can challenge the district court. On docket 203 on page 3 and 4 said, if you can make a showing that you need a bona fide, if you need these funds for a bona fide right to counsel, we will hold a hearing. That was both under Moya Gomez. Jones had the opportunity to make both. Where in the course of proceedings did that occur? So that was. Notification. Well, the indictments had the notice to seek forfeiture at the beginning. And then between the gun case and the health care case is when the government sought to pretrial restrain the life insurance policies. And then just a few days later, the district court, I think the same day, excuse me, the district court granted the restraining order. So this was before the health care trial, about six months before the health care trial. So he had every opportunity to make either of those showings. And is he represented at that point? Ms. Shrupp thought maybe not. There might have been like a day or two, but Inman was appointed at most like a couple days later. He was appointed in mid-April, and that happened in mid-April. So it's almost simultaneous. So he had about six months to make that challenge. And, again, all he had to do was use this court's well-established procedures in Moya-Gomez, in which he was invited to do so by the district court. This court should not unwind what happened because of Jones's failure to do so. And I would like to then turn to the point about whether he needed the assets. The PSR, I would point this court to the PSR, page 17. It estimated Jones's wealth, Dr. Jones's wealth, at $560,000. The government- So was that- Ms. Shrupp suggests that's out-of-date information, though, as of the time. The divorce and all the rest of that. That was the PSR after the health care trial. So I think it's dubious to claim that was out-of-date for something to happen before the health care trial. All the government restrained was the life insurance policies. This is a doctor with properties and homes in Indiana and Montana and Florida. The government only sought list pendants on three of the properties. And even still, list pendants aren't really restraints. It just serves as a notice. So there's no reason he couldn't have sold those or something about- Those were available during the time of this- Yes, there were some properties that had no list pendants on them at all, but even the ones that were- He had other assets in addition to these life insurance. Absolutely. Again, I think the PSR on page 17 is the best representation of that. And that's, again, the second PSR after the health care trial indicates that he had assets that he- So he could not have shown the bonafide need, which is, I think, possibly why he didn't utilize the Moya-Gomez proceeding, is because he knew that he had other assets. Were the insurance policies- How much value are we talking about? I think there were six of them. I think it's a little unclear. I know that he eventually agreed to forfeit two of them, which covered the $150,000 loss for the health care trial. And were those assets disclosed in the IFP application? No. The IFP application also said that he owned no vehicles, that he had no homes. So I think the IFP application in which the magistrate granted appointed counsel, I think, also would have fallen short what this court has said in Kirshenbaum. It would not have been anything more than a bare bones showing that he did not have funds. I think that would have fallen apart at any hearing, which, again, I think is a decent reason that the Moya-Gomez hearing wasn't requested. If there are no further questions of that, I would like to turn to the sentencing issue. Essentially, Jones's sentencing claim is that the term commencement of the offense cannot actually include the offense. That is not the proper way to read either 4A.1.2 or relevant conduct in context. Well, Ms. Shrupp is arguing that the offense is the thing that you're talking about in the indictment, and the indictment specifies a time period here. That is what the government had to prove at trial, yes. But for sentencing, information came in that he possessed the guns in 2001, 1996. The district court, and this is a factual finding that there's been no raising of clear error, that he possessed the guns and the ammunition, which that would have been easily within 15 years. This is like the 12,000 rounds they found on him? Right. To answer Judge Kaney's question, it was 47 guns and 14,000 rounds of ammunition. So because possession is a continuing offense, the commencement of the offense started at least the first point when we- Just out of curiosity, did he say why he needed so many weapons? No, Your Honor. Some people love guns. I think it's fair to say he really loved guns. They were spread out in three locations, so that might have helped explain somewhat why- People love guns, but- There's evidence that he possessed a number of those and continued to add to them over that 15-year stretch, or within the 15-year stretch from 1988. The government proved that by both the prenuptial agreement and the 2001 transfer agreement. There is evidence that he used the guns for personal protection during that point in time. You are saying that there is, in fact, evidence that this wasn't just possession in the most technical sense, locked up someplace to which he has no access. Absolutely not. In his Indiana home, there was a loaded shotgun found in a closet commingled with men's clothing, which would be a typical personal protection location. In Montana, which, by the way, his wife had never been to, so the whole defense was that the guns were his wife's or she was safekeeping them for him, so he may have owned them but not possessed them. Well, she had never been to the Montana cabin. Only he had been, so the guns there almost invariably were his. Moreover, he was- They were in a gun safe? They were in a gun safe. However, a neighbor, a Montana park ranger, testified that he had a revolver that was, by the way, not a black powder pistol. She was cross-examined on that point very closely, and she said, absolutely not, that is a modern pistol. He said he was using that for personal protection. Moreover, he had a shooting range at the Montana cabin with the targets, and there were bullets behind it, so he clearly had been using those for shooting at that point in time, too. So the commencement of the offense clearly started within the 15-year time period. Mr. Wright, can I follow up on one other issue on the forfeiture question? Did the government have any basis for treating the life insurance policies as tainted assets at the time of the ex parte application? Well, we-certainly there isn't much in the record. I think that's mainly because we did not have Demoyer-Gomez. However, that is, we did believe and we thought if put to a burden, either at the Demoyer-Gomez hearing or at the forfeiture after the conviction, we would have been able to prove that. I think the easiest way to explain that here is that his entire job was fraud, essentially. So he was making money by health care, and basically everything he billed was fraudulent, and so the money going into that was almost going to inherently be fraudulent. Now, I can't- No legitimate income as far as the government's concerned? No. I mean, he was billing family- He didn't do any legitimate-I mean, I can understand overbilling. I can understand, you know, charging the 2-year-old for the 75-minute session, but it seems not necessarily a consequence that he doesn't also have mixed in there some legitimate appointments in which he is providing health care services for somebody. Yeah, I guess I should be clear. I think when-say when he saw a family of five and charged them five individual billing sessions, that was fraud. However, he would have been entitled to the smaller family billing, so there would have been a little- Right, and maybe one time he sees an individual and he charges for an individual. I mean, are you saying there's nothing like that? Well, the individual is a little tricky, Your Honor, because that is only supposed to be used for someone that essentially was suicidal. But there would have been some-again, one example was a person that saw him five times and was billed 237 times. So within those five, yes, there may have been untainted assets. Maybe the person came in five times, yeah. Yes, he did. So those five times- That doesn't get me up to 100%. Maybe it gets up to a big number. Yeah, sorry, the government should have been a little more clear. Maybe not 100%, but a large, large portion of it would have been. And we think that if we would have been put to our burden, we easily would have shown that probable cause. Certainly there's nothing to point to in the record, but that is directly because we never had the Moya-Gomez hearing. And if we had, if Jones had asked for it, we would have been able to show that. Could I take you to a different subject as well, and frankly the one that concerns me the most in this case, which is the very difficult relationship between Mr. Jones and Mr. Inman, which is I'm not sure I've seen a record of more tension between counsel and client where a substitute was denied. I understand you to be arguing the court was entitled to look at the whole history of the case, and how many lawyers did Dr. Jones go through from the beginning? He had one pre-indictment, one we negotiated his surrender with, then he had three in the first trial, and then he was on his sixth. So we can split it. I know Jones is trying to split it with the adversarial portion, but we dealt with six. Inman was the sixth attorney we had dealt with. And how many of those were court appointed? Inman was the first. First, okay. I think it was proper for the district court to view his obstinacy and what a factual finding that he was trying to delay the trials all in context. Again, this was one single indictment. It was separated in trial, but it was one proceeding. It could also consider, for example, the self-administration of drugs that wound up delaying the first trial, right? And the district court made multiple factual findings that that was actually an intentional obstruction of justice that was supported by the competency hearing. I would point the court to docket 148 where the psychiatrist found that he was deceptive in nature. As to, yes, going back to the main substitution of counsel argument, it is certainly true there was some animosity between the two, but I think all that animosity revolved around Jones wanting Inman to do something strategically about the trial that Inman did not think would work. I think this is very comparable to Volpentesta in which one of the attorneys called it Kafkaesque, and this court said, yes, the attorney was exasperated because he had a difficult client and they didn't see eye to eye. And that was certainly true here, but when you get down to it, it was who Inman was going to call, what questions Inman was going to ask, those sorts of things that are inherently tactical, and those are not the sort of communication breakdown that we reverse convictions for. Those are the things that happen many, many times between attorney and client. And while this one, maybe there is slightly more animosity, I don't think the line can be a little more animosity equals reversal. It has to be full communication breakdown. And I would like to make one point of clarification before I sit down. In retrospect, the harmless error analysis for the right to testify should actually be the Chapman Constitutional Standard. That's on page 24 of our brief. We think we meet that standard for the same reasons expressed in our brief, but we would agree that the Chapman Standard is proper. For these reasons, we would ask this court to affirm the district court. Thank you. All right. Thank you very much, Mr. Wright. Anything further, Ms. Schrupp? Yes, Your Honor. Just three quick points in rebuttal. With respect to the sentencing, we're talking about timing here and the element of possession. It's not the fact of his guns or the number of the type. And 4K1.1 and 4K1.2 tether the 15-year look back to the commencement of the instant offense. That's what it says. And this court's cases and the guidelines define instant offense solely with respect to the time charged in the indictment. So now the government is talking out of the other side of its mouth, trying to recast its instant offense that it chose to charge, and it says in its brief, the commencement of the instant offense occurred in 1996. That's inconsistent with this court's cases and with the guidelines and with 4K1.1. With respect to the Luis issue, Your Honor, Judge Hamilton, I want to get back to just two quick points about that. First of all, the government can see – well, first of all, Luis changed the calculus because it moved sooner the government's burden. So Moya Gomez doesn't really matter after Luis was decided because now the government bears, at an issue, the burden of making a showing that these assets are tainted before they may be restrained. So that argument was not available to him before. And what's more, the government has conceded that it made no showing about the nature of the policies or anything else. So whether you view it under plain error, that's what plain error is for, to correct errors after the fact. And it would be at minimum plain error in its failure to meet its probable cause burden. Well, typically, plain error requires a showing of some kind of substantive injustice. And I would think that that would require a showing, some kind of showing, that he would have actually had some prospect of succeeding in all this, that he was prejudiced by the failure to hire yet another lawyer of his own choice and so on. Well, he was given Mark Inman, and you just pointed out the many, many problems with that representation. Well, I know Mr. Inman is also a very experienced and able lawyer. One of the most experienced criminal defense lawyers in Central Indiana. But the relationship that unfolded, Your Honor, and I think that is right, Your Honor, but I think that the relationship that unfolded there was one that sort of exceeds the bounds of what we have seen before in terms of these kinds of cases. And if he had, I mean, the district court did grant him IFP. But wasn't that a mistake? Well, I don't know. I don't think so, Your Honor. Because, I mean, maybe there were assets listed. But at the time, the district court accepted. It was the magistrate. The magistrate judge. Yeah. I'm sorry, the magistrate judge. If there are no further questions, we ask this court reverse. Thank you. All right. Thank you very much. We appreciate the clinic's efforts on behalf of Mr. Jones. And we will take the case under advisement. Thanks, of course, as well to the government.